UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

———————————————

In re:

SI GRAND TRAVERSE LLC, [1]                    Case No. DT 11-04316
                                              Chapter 11
                    Debtor.                   Hon. Scott W. Dales

———————————————————————/

OPINION AND ORDER REGARDING SECOND MOTION FOR USE OF CASH
COLLATERAL, MOTION TO CONVERT OR DISMISS, AND MOTION TO LIFT STAY

PRESENT:    HONORABLE SCOTT W. DALES
            United States Bankruptcy Judge

I. INTRODUCTION

SI Grand Traverse L.L.C., the operator of the Sleep Inn hotel franchise located at 5520

US-31 North, in Acme, Michigan (the "Hotel"), filed a voluntary petition for relief under chapter

11 with this court on April 18, 2011. Nine days after filing its petition, the Debtor filed its first

motion for permission to use cash collateral,[2] which the court denied because the Debtor failed to

prove it could adequately protect the interests of its largest secured creditor, CB 2010, LLC ("CB

2010"). With the court's permission, the Debtor renewed its request for authority to use CB

2010's cash collateral.[3] The court conducted an evidentiary hearing regarding the Second Cash

Collateral Motion on May 25, 2011, together with the closely-related motions of CB 2010 to lift

the automatic stay, and the United States Trustee to dismiss or convert the case.[4]

---

[1] Aliases for SI Grand Traverse L.L.C.: fka Sleep Grand Traverse, LLC; fdba Sleep Inn Grand Traverse; aka Sleep Inn & Suites. In this opinion, the court shall refer to SI Grand Traverse L.L.C. as the "Debtor."

[2] *See* Motion of SI Grand Traverse L.L.C. for Entry of Interim and Final Orders (A) Authorizing the Use [of] Cash Collateral, (B) Granting Adequate Protection to Prepetition Lender and (C) Scheduling Expedited and Final Hearings (the "First Cash Collateral Motion," DN 11).

[3] *See* Second Motion of SI Grand Traverse L.L.C., for Entry of Interim and Final Orders Authorizing the Use [of] Cash Collateral and Request for Hearing (the "Second Cash Collateral Motion," DN 54).

[4] *See* Motion to Lift Stay or to Appoint Trustee ("Lift Stay Motion," DN 7) *and* Motion of the United States Trustee for Conversion of Chapter 11 Case (the "Conversion Motion," DN 21).

The following constitutes the court's findings of fact and conclusions of law in accordance with Fed. R. Civ. P. 52, made applicable to these contested matters by Fed. R. Bankr. P. 7052.

## II. JURISDICTION

The court has jurisdiction over the Debtor's bankruptcy case pursuant to 28 U.S.C. § 1334(a). Pursuant to 28 U.S.C. § 157(b)(2)(A), (G), & (M), each of these contested matters is a core proceeding, as they involve the administration of the case, the automatic stay, and the use of cash collateral. The United States District Court has referred these matters to the bankruptcy court pursuant to 28 U.S.C. §157(a) and LCivR 83.2(a) (W.D. Mich.). Therefore, the court has authority to enter final judgment, subject to appellate review under 28 U.S.C. § 158.

## III. ANALYSIS

### A. The Secured Creditors

As noted above, CB 2010 is the Debtor's largest creditor, asserting claims secured by a first lien on the Hotel and related rents, and a third lien on the same collateral, in the amounts of $1,403,643.00 and $364,628.00, respectively. CB 2010 holds its two claims by virtue of an assignment or assignments, directly or indirectly, from Republic Bank, the Debtor's original lender.

The Debtor's second lien lender, the U.S. Small Business Administration (the "SBA"), finds itself wedged between CB 2010's first and third position, asserting a second lien to secure a claim against the Debtor in the amount of $706,585.00. There is no controversy that the Debtor's total secured obligations to CB 2010 and the SBA equal at least $2,474,856.00.

At the risk of oversimplifying the controversy, the court notes that the SBA is willing to cooperate with the Debtor by consenting to the use of its cash collateral but CB 2010 has expressed considerable lack of confidence in the Debtor's management, and has so far been unwilling to consent to the use of its cash collateral.

At the hearing, the Debtor offered the testimony of an appraiser, Mark J. Faucher, as well as testimony again from Mr. William Malek and Mr. Robert Rodenroth, both who testified during the hearing on the First Cash Collateral Motion. The witnesses testified credibly.

In addition to the testimonial evidence, the Debtor introduced an appraisal report dated April 29, 2011 from Mr. Faucher, daily operating reports for the Hotel, and projections that Mr. Malek and Mr. Rodenroth prepared showing the Debtor's future income and expenses for the twelve-month period ending April, 2012.  The court also admitted other documentary evidence, including bank statements for the Debtor's post-petition accounts, an unsigned document purporting to amend the Debtor's franchise agreement with respect to the "Property Improvement Plan" or "PIP" payments, and documents referring to a guaranty from the SBA.

B. Cash Collateral Motion

In resolving any controversy about the use of cash collateral the court must identify the interest to be protected and the value of that interest.  In addition, the court must consider the debtor's proposed adequate protection before the court may authorize any use of cash collateral. As the court noted previously, Congress has expressed in the strongest terms the federal policy of protecting a secured creditor's interest in collateral generally, cash collateral more specifically, and even more specifically, hotel rents such as those at issue in these contested matters. *See* 11 U.S.C. §§ 361, 363(c)(2), and 552(b)(2).

Congress has assigned the various burdens of proof in such matters as follows: the entity asserting an interest in property —here CB 2010— must establish the validity, priority, and extent of its interest; the Debtor, having assumed the duties of a trustee, "bears the burden of proof on the issue of adequate protection." 11 U.S.C. § 363(p). As applied here, because there is no dispute,[5] the court finds that CB 2010 has met its burden of establishing its right to adequate protection of its first and third lien positions in the amounts indicated above. The principal issue in controversy, therefore, is the Debtor's proposed means of providing adequate protection.

CB 2010 has two distinct types of collateral. First, of course, the creditor has a mortgage lien on the Hotel, which is to say the real estate —bricks and mortar— and personal property used in the operation. Second, CB 2010 asserts a lien on the rents or revenues derived from the property. According to the Debtor's Schedule D, CB 2010 has the first and third mortgages on the Hotel and an "all asset lien via UCC1." In addition, from the court's prior review of the mortgage documents, CB 2010 also benefits from an assignment of rents. Moreover, to the extent that the rents take the form of personal property, by its admissions in Schedule D, the Debtor concedes that CB 2010 has an interest in the rents. Were that insufficient, the Bankruptcy Code itself presumptively protects a lender's interest in hotel revenues. *See* 11 U.S.C. § 552(b)(2).

As the Debtor's own legal authority demonstrates, Michigan recognizes that the rents associated with real estate are distinct species of collateral deserving of protection. *See Smith v. Mutual Benefit Life Ins. Co.*, 106 NW2d 515 (Mich. 1960). For their part, courts in our circuit have similarly recognized that an interest in rents (as distinct from the land and improvements) deserves adequate protection. *See In re Coventry Commons Assoc.*, 143 B.R. 837 (E.D. Mich.

---

[5] *See* Schedule D (scheduling CB 2010's two secured claims, without listing either as disputed); Fed. R. Evid. 201 (judicial notice) and 801(d)(2) (non-hearsay).

1992); *In re Buttermilk Town Center, LLC*, 442 B.R. 558 (6th Cir. BAP 2010); *In re Mt. Pleasant Ltd. Partnership*, 144 B.R. 727 (Bankr. W.D. Mich. 1992).  Because CB 2010 has an interest in rents, and because rents constitute "cash collateral," and because the Debtor proposes to operate its business using this cash collateral, the Debtor must adequately protect CB 2010's interest in the rents.

According to the Debtor's projections, the Debtor expects to spend $309,754.00 of cash collateral during the next three (and busiest) months. *See* Debtor's Exh. 1.  Because Congress has specified in 11 U.S.C. § 552(b)(2) that CB 2010's pre-petition lien extends to post-petition rents, the court concludes that the cash collateral to be protected during the next three months includes rents in the amount that the Debtor proposes to expend during this period, namely $309,754.00.

To meet its burden of establishing adequate protection, the Debtor makes several arguments.  First, the Debtor relies on the appraisal report and testimony of its expert witness, Mr. Faucher, to establish an equity cushion.  Despite some confusing testimony on cross-examination regarding one aspect of the "income approach" to valuation, Mr. Faucher testified helpfully and credibly regarding his opinion of value.  In addition, the court has carefully reviewed his appraisal report.  *See* Debtor's Exh. 2A (the "Appraisal").  In Mr. Faucher's expert opinion, the Hotel is worth $2.4 million.  *Id.*[6]

The Appraisal is a "summary report"[7] premised largely, though not exclusively, on the income approach to value. Mr. Faucher testified that in cases involving income-producing property such as the Hotel, appraisers generally favor the income approach over the cost approach. Moreover, in cases in which sales comparables are not readily available, it also makes

---

[6] At the hearing to consider the First Cash Collateral Motion, based on the testimony of the Debtor's principal, Jeffrey M. Adcock, the court found that the Hotel was worth approximately $2.1 million.
[7] The Debtor also introduced back up data that Mr. Faucher used in preparing the Appraisal.  *See* Debtor's Exh. 2B.

sense to elevate the income approach over the sales comparison approach, as Mr. Faucher reasonably did.[8]

With respect to Mr. Faucher's income approach, he explained his three-fold analysis including the "capitalization method," the "equity return rate method," and the "discounted cash flow valuation." *See* Debtor's Exh. 2A at pp. 153-92.  The court accepts the appraiser's income approach calculations for determining value as of April 29, 2011. *Id.* at p.12 (summary of value conclusion).

Significantly, however, Mr. Faucher's conclusion that the property is worth $2.4 million depends upon maintaining the Hotel as part of a national brand franchise such as Sleep Inn for perfectly good reasons he articulated in his Appraisal.  He also explained that maintaining this franchise relationship depends in part upon the franchisee's compliance with the PIP prescribed by the franchisor, in this case, Choice Hotels.  For example, at page 57 of the Appraisal, Mr. Faucher indicates that in order to maintain the franchise, the Debtor must expend $499,000.00 on PIP.  Indeed, this $499,000.00 figure attributable to the Debtor's PIP obligations reduces dollar-for-dollar the appraiser's estimate of value.  *See* Debtor's Exh. 2A at p. 12.

Separate from this Appraisal, the Debtor has offered its projections regarding the PIP and an unsigned document purporting to extend the Debtor's timeframe for meeting its PIP obligations.  *See* Debtor's Exh. 1 (projections); Debtor's Exh. 5 (AES Addendum). As far as the court understands them, the Debtor's projections include a modest allocation for PIP over the next 12 months in the amount of only $80,000.00 —substantially less than the $499,000.00 that the Debtor's managers evidently reported to Mr. Faucher as he was preparing the Appraisal.  As

---

[8]  The Debtor's expert undertook a sales comparison approach to valuation, but candidly minimized its importance to his analysis. *See* Debtor's Exh. 2A at pp. 132-52.   The court shares this sentiment because, for the most part, the comparables reflect transactions in markets somewhat remote from Traverse City, including Grand Rapids, Muskegon and Mackinaw City, and different in material respects.

noted above, Mr. Faucher's $2.4 million value conclusion, and specifically the income approach, depends to a considerable degree on satisfying the PIP requirements and, more generally, preserving the franchise relationship with a national brand.

In addition, Mr. Faucher's Appraisal relies on relatively optimistic increases in the Debtor's occupancy and average daily rate indicators. It appears that Mr. Faucher projects roughly a 4% increase in occupancy across the state, based on market data that the court has no reason to doubt, and yet the Debtor projects substantially greater increases in such rates for this particular Hotel. Indeed, for the Debtor's Hotel, the "average daily rate" increased 10.81% from 2009 to 2010 according to Mr. Faucher. Such an increase in a recognized indicator of hotel performance does seem like a favorable trend. However, elsewhere in the report, Mr. Faucher undercuts the optimism in last year's figures by explaining, plausibly, that Michigan experienced especially bad weather in 2009 (depressing tourism) and especially good weather in 2010 (exaggerating the recovery). *See* Debtor's Exh. 2A at pp. 80, 109. The court infers that the weather-related dip in tourism in 2009 coupled with the weather-related surge in 2010 likely distorts the supposed tourism recovery.

Perhaps if there were in fact an equity cushion between Mr. Faucher's value of $2.4 million and the amount of the secured debt ($2.47 million) the court would be less-troubled by Mr. Faucher's optimism. However, because the Debtor's adequate protection of CB 2010's cash collateral depends exclusively on this valuation, the court is uncomfortable concluding that an "equity cushion" adequately protects CB 2010's interest.

The Debtor frankly and commendably recognizes this shortfall, but argues that the SBA's supposed guaranty of 75% of CB 2010's third lien position should somehow factor into the equity cushion and adequate protection analysis. The court cannot agree with this argument for

several reasons.  First, the only evidence of the SBA guaranty is Debtor's Exh. 4 (CB 2010's state court complaint at paragraph 24) which contains a judicial admission by CB 2010 that the SBA has guaranteed the third lien position of its predecessor in interest, Republic Bank.  The Debtor has also offered Exh. 3, an unsigned "authorization" referring to a 75% guaranty in favor of Republic Bank.  Assuming for the sake of argument that the unsigned document represents the terms of the guaranty, it is not clear whether the guaranty inures to CB 2010's benefit as assignee.  *See, e.g.,* 13 C.F.R. § 120.432(a) (authorizing sale of Section 7(a) loan to "participating Lender" but forbidding sale to "non-participating Lender"). In other words, the Debtor's adequate protection proposal depends upon a guaranty document that was not introduced at the hearing and that may or may not be assignable.   Because so much of the Debtor's adequate protection of CB 2010's interest depends upon its argument about the SBA 75% guaranty, the court would have expected,  and certainly requires as a condition of meeting the Debtor's burden, better evidence supporting the supposed guaranty running in CB 2010's favor.

The court acknowledges that the guaranty documents run between the SBA and the lender (rather than the Debtor), making it perhaps difficult for the Debtor to obtain proof of this crucial part of its adequate protection case.  Nevertheless, more than a month into this case the court would have expected the Debtor to have obtained copies of the guaranty documents either from the SBA, given that entity's apparent cooperation, or from Republic Bank (or its successor), given the court's subpoena power under Fed. R. Civ. P. 45 and Fed. R. Bankr. P. 9016.

As the court endeavored to explain at the hearing, the post-petition rents are subject to the pre-petition liens of the secured creditors, given the nature of the collateral and the loan

documents. In response to the suggestion that the court made at a prior hearing, the Debtor's counsel argued that the court should eliminate or liberate post-petition rents from the lender's liens as contemplated in the last sentence of 11 U.S.C. § 552(b)(2), but the Debtor's counsel offered no evidence in support of any equitable reason (other than the Debtor's desire to reorganize) to depart from the presumptive extension of pre-petition liens to post-petition rents. Having considered the record as a whole, and acknowledging that this case is in its infancy, the court is not prepared to disengage the rents from CB 2010's security interest. In reaching this decision, the court has considered a number of factors, including concerns about the Debtor's prepetition management described during the hearing on the First Cash Collateral Motion,[9] especially the grossly underfunded allocation for the PIP which the court regards as a substantial threat not just to the cash collateral, but to the business as a going concern. *See* Debtor's Exh. 2A at p. 57.

In short, the court is not satisfied that the Debtor met its burden of proof with respect to adequate protection. *See* 11 U.S.C. § 363(p). For this reason, the court will deny the Debtor's Second Cash Collateral Motion.

### C. Conversion Motion

The court has also considered the Conversion Motion, which largely depends on the Debtor's admittedly unauthorized use of $3,000.00 in cash collateral early in the case,[10] and the Debtor's inability to fund operations given the court's refusal to permit use of cash collateral over CB 2010's objection. Under 11 U.S.C. § 1112, the Debtor's unauthorized use of cash collateral is cause to convert or dismiss, provided such use was "substantially harmful" to CB

---

[9] *See* Transcript of hearing held May 2, 2011 (DN 45, hereinafter "Tr. at") at pp. 29-30 (regarding the magnitude of the PIP expense), 52 (payments to insider's wife as "secret shopper" who meets with staff), and 54 (substantial fees and car expenses as "draw" for insider who consults from Texas).

[10] *See* Tr. at p. 72.

2010.  In the present case, though reasonable minds may disagree about whether the use of $3,000.00 to make payroll substantially harmed one or more creditors, the court is also mindful that this payment violated not only 11 U.S.C. § 363(c)(2), but also the court's Definitive Order for Debtor-in-Possession, dated April 19, 2011. *See* 11 U.S.C. § 1112(b)(4)(E) (cause includes failure to comply with court order).  Similarly, the court agrees with the United States Trustee that as a result of the court's denial of the use of cash collateral, the Debtor's cannot continue to operate the Hotel.  Although Mr. Adcock may have provided "equity" infusions to keep the Debtor afloat during the cash collateral controversy, there is nothing in the record to suggest that he can or will continue to fund operations.  Similarly, there is no evidence of any post-petition financing in the wind much less the record, so it is more likely than not that the Debtor will cease operations, jeopardize its franchise, substantially diminish the estate, and doom any prospect for rehabilitation.

In addition, the court notes that five weeks have passed since the Debtor filed its bankruptcy petition, but the Debtor has not yet filed an application to appoint professionals under 11 U.S.C. § 327.  It is sometimes difficult to determine whether Section 327 requires approval of particular professionals or whether the Debtor may simply continue pre-petition engagements without the vetting and court approval that Section 327 contemplates. In our district, it is customary to retain turnaround or insolvency professionals, auctioneers, and even realtors under Section 327.  Certainly, Debtor's counsel and Mr. Malek (a turnaround consultant) fall within Section 327's ambit. And, given the role of Mr. Rodenroth's firm, the court could likewise conclude that the Debtor must comply with Section 327 with respect to that firm.  From the testimony adduced at the two cash collateral hearings, it appears that Mr. Rodenroth and his firm have significant influence over and control of the Debtor despite the fact that the firm is a

vendor.  Retention under Section 327 under these circumstances may be required, if not simply prudent. Under these unfortunate circumstances, "cause" exists to convert or dismiss the case. *See* 11 U.S.C. § 1112(b)(4)(A), (D), and (E).

Section 1112, however, provides a safety valve in the form of the proposed appointment of a trustee if the court finds that such an appointment is in the best interest of the creditors and the estate.  *Id.* § 1112(b)(1).  On the present record, the court readily determines that the appointment of a Chapter 11 trustee under 11 U.S.C. § 1104, rather than conversion or dismissal, better serves creditors and the estate.  First, CB 2010 and, for that matter, the SBA, would seem to agree that payment of claims depends upon continued operation of the Hotel.  Although CB 2010 refused to work with the Debtor's management, its statements in open court and in court filings clearly evince its desire that the Hotel continue operating either under the direction of a Chapter 11 trustee or in a state court receivership.  CB 2010's recent filings expressly state its willingness to negotiate with a Chapter 11 trustee.

Conversion or dismissal would likely lead to a state court receivership, and the court has doubts about the efficacy of such a proceeding for several reasons.  First, unlike the Bankruptcy Code, state receivership practice does not generally include structural and well-established protection for unsecured creditors, such as committees, the United States Trustee program, disinterested professionals, Chapter 5 recoveries, among other bulwarks.  Although there is a relatively small unsecured creditor constituency, the court is not willing to ignore these interests. Second, conversion (and for that matter relief from stay) would likely result in a state court exercising *in rem* jurisdiction over the Hotel at the same time that the property of the estate remains in federal *custodia legis*.  *See* 28 U.S.C. § 1334(e) (granting exclusive *in rem* jurisdiction to the United States District Court over property of the bankruptcy estate). Although

this result is not technically impossible, it strikes the court as certainly impractical under the circumstances of this case. In any event, dueling proceedings are conducive to unnecessary tension between the state and federal courts, and possible waste of scarce resources expended in resolving jurisdictional controversies.

The court suspects that the cash collateral controversy and ensuing litigation with CB 2010 resulting in three hearings in two cities in five weeks may have distracted the Debtor's attention away from its obligations under the Bankruptcy Code, wasting time, energy, and resources that could be better-employed in running the business.  The Debtor and its principal secured creditor are in deadlock and the court believes that this fact also counsels in favor of appointing a neutral manager, such as a Chapter 11 trustee, to run the business.  In making these observations, the court does not intend to cast aspersions on any person but rather to resolve the obvious impasse that stands between the Debtor and its rehabilitation.

Under these circumstances, the court finds that appointing a trustee is clearly the preferable alternative to conversion or dismissal. Accordingly, the court will grant the Conversion Motion  to some extent by directing the United States Trustee to appoint a Chapter 11 trustee.  Notwithstanding the request of CB 2010 to select the Chapter 11 trustee, the court will follow the statute and permit the United States Trustee to select the Chapter 11 trustee.

D. Lift Stay Motion

Because CB 2010's Lift Stay Motion sought the appointment of a Chapter 11 trustee as an alternative to stay relief, and because the court intends through this order to grant that relief, the court will deny the Lift Stay Motion as moot.

IV. CONCLUSION & ORDER

The court believes that appointment of a Chapter 11 Trustee is in the best interests of all constituents, and represents the Debtor's best hope for reorganization under the circumstances of the case.

NOW, THEREFORE, IT IS HEREBY ORDERED that the Second Cash Collateral Motion (DN 54) is DENIED.

IT IS FURTHER ORDERED that the Conversion Motion (DN 21) is GRANTED IN PART but only to the extent that the United States Trustee is hereby authorized and directed to appoint a Chapter 11 trustee forthwith.

IT IS FURTHER ORDERED that the Lift Stay Motion (DN 7) is DENIED AS MOOT.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Order and Opinion pursuant to Fed. R. Bankr. P. 9022 and LBR 5005-4 upon Michael P. Corcoran, Esq., Agnes M. Kempker-Cloyd, Esq., Mark E. Hills, Esq., Donald A. Snide, Esq., Wallace Tuttle, Esq., the United States Trustee, and all parties listed on the Debtor's mailing matrix, and all parties who have requested notice of these proceedings.

END OF ORDER

**IT IS SO ORDERED.**

Scott W. Dales
United States Bankruptcy Judge

**Dated: May 31, 2011**